Argument of the morning is in Appeal No. 23-1787, Circle City Broadcasting v. AT&T and DirecTV. Mr. McNeil, good morning, whenever you're ready. May it please the court, Andrew McNeil on behalf of Circle City Broadcasting, Circle City 1 Broadcasting. This case is a pretext case and the law of pretext in this circuit is that when there are inconsistencies, implausibilities, contradictory statements or weaknesses that are shown in a stated reason for a certain action, then a reasonable fact finder can conclude that that stated reason is unworthy of credence. And from there, at the summary judgment stage, that's sufficient to move beyond summary judgment into trial. And so the facts of this case were considered by the district court, and in doing so, the district court took DirecTV's version of events, credited them in the face of contrary, inconsistent, contradictory testimony, and granted their motion for summary judgment. Starting with what is that pretext evidence, we start with the general provision in the DirecTV retransmission consent agreement that we see over and over again. This is Section 11B, the change in control provision, that says when Nexstar, who sold Circle City, Channel 8 and Channel 23 in Indianapolis, when Nexstar sells stations to a buyer who does not already have a contract with DirecTV, then Nexstar must secure from that buyer an agreement to assume and perform under the existing DirecTV-Nexstar agreement. So, Mr. McNeil, what worries me about this case is, I mean, I'm looking for evidence to see that the reason the things that you're talking about didn't happen was a racially, an impermissible racially-based reason. And I would like you to just summarize for me the best evidence you think there is in the record that would tie the fact that these recently purchased stations by Circle City didn't command the same kind of price that the Nexstar package did. Because it seems to me there are all sorts of reasons why that might have been, and I can't find race among them. Thank you, Your Honor. So the question of whether what Circle City was asking for was not necessarily the Nexstar rate, but what MVPDs would pay for Circle City's stations in Indianapolis. And what DirecTV did, knowing that DeJuan McCoy is a black man and the owner of Circle City, excluded Circle City by name from the change in control provision in an unprecedented provision in a DirecTV contract. They could not identify another contract where a station group was excluded by name from this change in control provision. So we have that. Then we have Linda Burakoff's post-deposition affidavit that says, well, it's our general practice not to offer fees to these standalone non-Big Four stations. But that general practice does not square at all with this change in control language in Section 11B. Because 11B presumes that the rate follows the station when the purchaser does not already have a contract, which was Circle City's situation. That's where I'm having trouble, because the reasons that are stated in the record are that any kind of standalone station, whether owned by Mr. McCoy or owned by you or me or anything, which has free over-the-air streaming available for people and which doesn't have the advantages of these big packages. And so we have a whole concept in antitrust law about bundling. It's a different product when they are severed off from the overall package that they used to be part of. And so I can't understand why, again, we're going to assume that the reason the price it can command is lower has anything to do with factors other than these structural factors. Well, let's look at the evidence or talk about the evidence of these structural factors that are in the record. Because what they are is after-the-fact justifications for conduct that's already occurred. So when Circle City acquired the stations, DirecTV's first offer for these two stations was a no-fee contract. Mr. McCoy responded immediately and said no fees are out of the question. Right, and even a no-fee contract would be of some value because you'd have coverage. You'd be in the DirecTV package and viewers would be looking at your content. Well, but the 1981 standard is not whether you'll do a contract with me, but whether you'll do a contract with me on terms that aren't discriminatory. Precisely. And so what's the evidence that if these two stations had been purchased by somebody who was not in a protected group that the pricing discussions would have been any different? Well, but it's the pretext standard that allows once their stated reason is called into question, at summary judgment, the court's only function is to determine whether there's credible doubt about the reasons offered. And so here what we have is, remember, this standalone non-Big Four justification does not surface until the very end of the negotiations. Because what was said up until the very end was we've got your fee proposal, we're considering it. Their internal deal summary says if we have to pay a fee, we want to keep the term short. It also says fees are the main issue in this deal. What the negotiator for DirecTV never said was, until the end of January 2020, if you want a fee, we can't pay you. If you want a fee, you need to purchase a Big Four station. Or they didn't say, we have a policy against paying fees to non-Big Four stations. Instead, what they said is, we're considering your proposal, we're working on a counterproposal, and we'll get back to you. And it wasn't until Circle City unequivocally said, I can no longer because of my most favored nation rate provisions with my other MVPDs. When they said that, DirecTV finally says, well, you know, we have this policy against paying these standalone non-Big Four stations. So what we have is a— So, counsel, is it your contention that DirecTV didn't actually have that policy? No, it's my contention, Your Honor, that from a pretext standpoint, even if something has a factual basis, if it's not the reason for the action taken in a discrimination case, then it's pretextual. So whether they had that—in Julia Dye's deal summary in December of 2019, she eliminates the language that says, if we have to pay a fee, keep the term short, and replaces it with this list of other so-called standalone non-Big Four stations that they used to pay, but they don't pay now. When asked why she made that change, she said, there was no reason. It's just another way of writing my report. So when you have—plus what you also have is for Wish TV, you had historically provisions in the Media General and NextStar contract that put Wish TV in its own independent tier. But what are we to make of all the other examples that DirecTV gave of contracts they entered into where they didn't pay a fee for standalone non-Big Four stations, and the evidence that they never actually, for standalone non-Big Four stations, have paid a fee? Well, that's DirecTV's story to tell to the jury. Wish TV's response to that is none of those other stations identified by DirecTV carried the same status that Wish. There were only two, Wish and KRON in San Francisco, that were given this middle-tier rate status. Not one of those other stations that DirecTV identified was ever placed in a rate category like Wish TV was. So there's this local news definition that appears in the 2019 agreement, and it's based on producing 50 or more hours of independent original news content. And while Wish was being sold at the time, it met that standard. It produced that content of local news, and that's why it's a valuable property, and that's why it's completely unlike these other stations that DirecTV identified the 11th hour of the negotiation. I have one question. Does the record show us whether Circle City, upon learning that the retransmission fees were not going to continue, whether it reduced the purchase price that it paid to Nextstar? Yes, and I'm getting into my rebuttal time, but I'm happy to answer that, because what the purchase price was based on was three conditions. Yes, the purchase price was reduced. The purchase price originally was based on getting an assignment of the DirecTV, Comcast, and Charter agreements. When this language appears for the first time ever, that Circle City, the black-owned company, is now redlined from DirecTV agreements, what is communicated to Circle City is we can't deliver the DirecTV agreement. That's when the price adjustment occurred to the purchase price from Nextstar. Okay. All right. We'll give you a minute on rebuttal. Thank you, Your Honor. You're welcome. Mr. Paul, good morning. May it please the Court. DirecTV has a uniform, consistent, and race-neutral practice. It does not pay fees for standalone, non-Big Four stations, and it has adhered to that practice going on nearly a decade. Since 2016, DirecTV has converted all of its legacy agreements with standalone, non-Big Four stations to no-fee agreements. DirecTV's practice is driven by market dynamics, not racial animus. And, in fact, Mr. McCoy admitted in his deposition that owning Big Four stations increases a station owner's bargaining power. So the most that Circle City can do is argue that certain facts are fishy in the hopes of creating some metaphysical doubt about DirecTV's motives. And there are two important points of law there that I'd like to mention. First, Mr. McNeil says that this is a pretext case. Well, the ultimate issue in determining whether an explanation for an allegedly discriminatory action is pretextual is whether it's a lie. Not whether it's seemingly unfair, unreasonable, or even wrong. None of those things are true here, and there's certainly no evidence of a lie. Secondly, this court's decision in Loudermilk, cited in the briefs, makes clear that an evaluation of context, context, is essential to determining whether a defendant's explanation for its actions is fishy enough to support an inference that the real reason must be discriminatory. So here's the relevant context and six points I'd like you to consider keeping in mind. One, if it had the choice, DirecTV would never pay fees for non-Big Four stations. Two, to the extent DirecTV pays fees at all for non-Big Four stations, it's to companies like Nexstar that own large portfolios of stations, including a large portfolio of Big Four stations, and they thus have the bargaining power to command retransmission fees. Third. So can I just interrupt you there? So that's your bundling point, basically, that entities like Nexstar are bringing DirecTV a package, basically. So am I right to assume that you don't break down within that package station A is getting, or do you? How much each station gets, or do you let Nexstar figure that out? Yeah, typically not by station, but by affiliation. CW stations, MNT stations, what have you. Correct. Okay. Three. When DirecTV is forced to pay a fee for non-Big Four stations, it pushes for contract terms that prevent those fees from traveling with the non-Big Four stations in the event that they're sold or transferred. And you can see this in the 2019 Nexstar Agreement, which is at ECF 153-10 at page 39. And you can also see this in the Bayou City Agreement, which Mr. McCoy was involved in, and in particular at sections 8C and 11A. Four. Circle City's own media attorney and agent, Dan Patrick, acknowledged in writing in 2017, two years before the Circle City negotiations, that DirecTV had this general position. Those are his words, general position of not paying fees for non-Big Four stations. Five. The FCC has recognized that DirecTV's refusal to pay a fee for a standalone non-Big Four station, in that case K5, was not in bad faith. That decision is in the record at 127-3 at pages 2 to 7. So does it make any difference whether DirecTV's decision to carry, let's say, WISH, without paying a fee, what's the consideration in a contract like that? What's DirecTV, DirecTV's getting content, so they're getting what WISH has to offer. So what's in it for WISH? Why give your business product away? Well, I'm not sure that that's necessarily reflected in the record, but I think that some of those fees are transferred ultimately to the station, and they get part of those fees on top of advertising revenue. Okay. And the final contextual point that I wanted to make is that there is no evidence that DirecTV has paid any fees for non-Big Four stations. Mr. Paul, what are we going to say? To make of Mr. McNeil's argument that it seems a little strange that Ms. Dye, I think who's the one that negotiated the agreement on behalf of DirecTV, didn't mention the policy right from the get-go. She could have said if this were indeed the policy, as you say it is, I'm sorry, it's our policy, corporate policy, can't do anything about it, sorry, good day. That would have certainly made the negotiations much more brief, right? And so what are we to make of that argument? Yeah. This policy, this practice was no secret to either Mr. McCoy or his media attorney Dan Kirkpatrick, and we discussed two particular transactions. Well, no, I guess I'm focusing on Ms. Dye and her notes. Right. Why didn't she? Right. Why not just stay from the get-go and say, I'm sorry, I wish I could accommodate you, but we have this long-standing policy where we can't give you any fees. We ultimately don't know why she, assuming the allegation is correct that she waited until January 2020 to relay this information, why she did that. But a couple of points about that. First, the FCC has held in this very context, in the order that I referenced earlier, that DirecTV does not have to provide an explanation for its bargaining position. That's at ECF 127-3 at page 6. And secondly, and maybe even more importantly, and in any event, she did ultimately explain that this was DirecTV's position, and she did so contemporaneously with the negotiations. What was the timing, Mr. Paul, of the modification of the change of control provision? The timing of that? Yeah, when did that happen? When there was that carve-out that Mr. McNeil was referring to. Yeah, that was discussed between Nexstar and DirecTV in August of 2019. When did the deal close? The deal closed in September of 2019. And so let me directly address the anti-assignment clause. First of all, I think it's important to remember that Nexstar, Nexstar is the one that proposed that clause. And Circle City's own evidence, and this is in the negotiation summaries that were produced by DirecTV between DirecTV and Nexstar, show that DirecTV did not immediately jump on that anti-assignment clause and did not immediately agree to it. Originally, DirecTV proposed general language consistent with its policy of preventing fees from traveling with non-Big Four stations. And it was in response to that language that Nexstar proposed this anti-assignment clause. And the parties went back and forth on those provisions for what looks like about a week. And ultimately, they both made it into the agreement. Again, Circle City's own evidence shows that. There's nothing to suggest that DirecTV accepted this clause for any discriminatory reason. In fact, the only evidence that I'm aware of in the record as to why DirecTV accepted this clause comes in Linda Burakov's deposition, where she essentially testified that it was consistent with DirecTV's general practice of precluding fees from traveling with non-Big Four stations. If Circle City couldn't take advantage of the agreement, it couldn't take advantage of the fees once those stations were sold off and became non-Big Four stations. And the last thing I would mention is that it's not as though Circle City is the only station owner mentioned in the agreement. There's an entire provision. Granted, it's not an anti-assignment clause. But there is a provision that's devoted to WGN America and Tribune Broadcasting as part of the same agreement. So it's not uncommon, as far as I can tell, for parties to mention particular station owners when there's an ongoing transaction. In terms of, finally, the contingency plan that Mr. McNeill mentions, I think it's important to read Julia Dye's notes in context. They say, hold firm on no-fee carriage. If we have to pay a fee, then keep the term short. So she was setting out DirecTV's general position, and then she said, we have this contingency plan. I think at most what that suggests is that this is a practice, a custom, or as Dan Kirkpatrick called it, a general position. It's not a commandment etched in stone, and it's entirely consistent with DirecTV's obligation to negotiate these agreements in a good faith. Unless there are any further questions, we respectfully ask the Court to affirm. Thank you. Mr. Paul, thanks to you. Mr. McNeill, we'll give you a minute on rebuttal. Thank you, Your Honor. The issues in this case get to what the Seventh Circuit has been trying to sort out in discrimination case law for several years. What DirecTV is attempting to do is put evidence in a silo and say, consider this silo. What we're saying is when you consider all of this evidence as a whole, the stated reasons offered by DirecTV show signs of inconsistency, suspicion, incompleteness. And it gets to this, it starts with the anti-assignment language. Because remember, paragraph 11B is the general practice that says when there's no contract with the buyer, the contract follows the stations. They allied past that by simply saying it's our general practice not to pay standalone big fours. That is a contradiction in the record. And then you get to Julia Dye's negotiation summaries, and they show an intent to conceal the true reason for their decision. I'm out of time. I thank you, Your Honor, as we ask that the District Court be reversed. Okay, very well. Thanks, Mr. McNeil. We'll take the appeal under advisement. Move to